## Case No. 13,547.

STROUD v. MISSOURI RIVER, FT. S. & G. R. CO.

[4 Dill. 396.] [1]

Circuit Court, D. Kansas. 1877.

CHEROKEE NEUTRAL LANDS — CONSTRUCTION OF TREATY WITH CHEROKEE NATION (14 STAT. 804) IN RESPECT TO RIGHTS OF ACTUAL SETTLERS — RIGHT TRANSFERABLE—MINERAL LANDS.

1. In the treaty between the United States and the Cherokee Nation of Indians, concluded July 19, 1866, ratified July 27, 1866, and proclaimed August 11, 1866 (14 Stat. 804), for the sale of a large tract of land known as the "Cherokee Neutral Lands," a preferable right was given to "actual settlers" to purchase, on certain terms, the land owned and personally occupied by them: Held, construing the treaty, as amended, that one who is an actual settler, within the meaning of the treaty, at the date of its ratification, and entitled to the benefit of its provisions, may, after that time, and before making proof under the regulations of the secretary of the interior, transfer his right to purchase the land to which he is entitled, and the grantee may make the required proof and purchase the land.

[Followed in Armsworthy v. Missouri River, Ft. S. & G. R. Co., Case No. 550.]

2. The land is not "mineral land" within the meaning of the treaty, because a coal deposit underlies it.

3. Whether the treaty, as finally amended, provides for one or two classes of settlers, discussed, but not decided.

This is a bill in equity, in which the plaintiff [James W. Stroud] claims to be one of the persons protected by the 17th article of the treaty hereinafter referred to, and in which he seeks to compel the defendant (who holds the legal title to the one hundred and sixty acres of land in controversy), to convey the same to him. All questions as to form of pleadings, sufficiency of tender, etc., are waived.

The case was submitted to the court on the following agreed statement of facts:

(1) That the real estate in controversy in this action, to-wit, the northeast quarter of section eighteen (18), township twenty-seven (27), range twenty-five (25), in Bourbon coun-

ty, state of Kansas, is a part and parcel of a tract of about eight hundred thousand acres of land, known as the "Cherokee Neutral Lands."

(2) That said tract of land was ceded to the United States by the Cherokee Nation, or tribe of Indians, by treaty concluded July 19th, A. D. 1866, ratified July 27th, A. D. 1866, and proclaimed August 11th, A. D. 1866.

(3) That previous to and on August 11th, A. D. 1866, one Peter Teel resided upon said northeast quarter (¼) of section eighteen (18), township twenty-seven (27), range twenty-five (25), and on and before that date said Teel made improvements on said land of the value of over fifty dollars ($50), to-wit, of the value of fifteen hundred dollars ($1,500), and on said day owned and occupied said improvements for agricultural purposes, and that said land was not mineral land (except that there is a stratum of coal underlying a portion of said quarter section). That said improvements were on and covered each of the forty-acre tracts embraced in said quarter section in controversy in this suit.

(4) That said Teel and said plaintiff had not enjoyed then, or previous thereto, the benefits of the pre-emption laws of the United States, and that said Teel was entitled to pre-emption under the pre-emption laws of the United States.

(5) That a commission was duly and legally appointed to appraise said land according to the provisions of said treaty; and that said commission met, some time in the year 1866, and appraised said land at two dollars ($2) per acre, in the aggregate at the sum of three hundred and twenty dollars ($320); and said commissioners were authorized and directed by the secretary of the interior to hear and receive proof relative to the claim of settlers under the seventeenth (17th) article of said treaty and the amendments thereto.

(6) That after the making and proclamation of said treaty, and before said commissioners met, the plaintiff, James W. Stroud, purchased all the right, title, and interest of said Teel in and to said land, and the improvements thereon, and paid him a valuable consideration therefor, and received from him a good and sufficient deed thereto; that plaintiff purchased the same for agricultural purposes; and that plaintiff, James W. Stroud, was in the actual possession and occupancy of the same when the said commissioners met to appraise said land, and had not then or previous thereto enjoyed the benefits of the pre-emption laws of the United States, and said plaintiff was entitled to pre-emption under the pre-emption laws of the United States.

(7) The plaintiff, under the rules and regulations prescribed by the secretary of the interior, went before said commissioners and made proof of the facts and each of them hereinbefore stated, for the purpose of pro-

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]

curing the privilege of purchasing said land under the provisions of said treaty; that this plaintiff made proof before said commissioners of the settlement of said Teel on said land prior to August 11th, A. D. 1866, and of the improvements thereon at said date, of the value of over fifty dollars ($50), of plaintiff's purchase from said Teel, and that Teel had not then, or prior thereto, enjoyed the benefits of the pre-emption laws of the United States; and of plaintiff's actual occupation and possession of said land when said commission met to appraise said land; and that said land was not mineral land, except as hereinbefore stated; and that plaintiff had purchased the same for agricultural purposes.

(8) That said commissioners and the secretary of the interior refused to allow this plaintiff to purchase said land, on the ground, as the plaintiff was by said commissioners informed, that the secretary of the interior had already decided that the right to purchase said lands, under the 17th article of said treaty and the amendments thereto, was personal to the settler who occupied said land at the date of the proclamation of said treaty, and that this plaintiff's purchase thereof was wholly void.

(9) That plaintiff then and there offered to pay said sum of three hundred and twenty dollars ($320), the appraised value of said land, to said commissioners, or to such person as said commissioners should designate; that said commissioners refused to accept said sum of three hundred and twenty dollars ($320), or any sum at all.

(10) That after the appraisal of said land, and after plaintiff had made his proof before said commissioners, as aforesaid, the secretary of the interior caused a patent for the land in controversy to issue from the United States to one James F. Joy; that afterwards said Joy sold and transferred the land in controversy to the said defendant, the Missouri River, Fort Scott and Gulf Railroad Company. It is agreed that Joy procured the title from the United States, as agent for the defendant.

(11) That said deed from said Teel to the plaintiff, James W. Stroud, for the land in controversy in this suit, was a quit-claim deed, duly and properly signed and delivered, but without acknowledgment; that said deed was never recorded by the register of deeds of the proper county; but that said plaintiff is now, and has been all the time since his purchase from said Teel, as aforesaid, in the open and notorious possession and occupancy of the land in controversy.

(12) The defendant has paid taxes on said land since the date of the transfer from said Joy, to-wit, from the 1st day of March, 1871.

Questions for Special Findings. To the Honorable Judges of the Circuit Court of the United States for the District of Kansas: Inasmuch as there are about two hundred persons residing upon said neutral lands, who claim under the provisions of the 17th article of said treaty and the amendments thereto, in all of which is involved the construction of some parts of said article, and many of which raise other questions under said article than those presented by the agreed facts in the foregoing case; and inasmuch as it is very desirable to have a rule of law established for the settlement of all these cases without prolonged and expensive litigation, the counsel for both parties hereto respectfully request your honorable court to construe and interpret the whole of said article and the amendments thereto; and in so doing to find upon the following questions, all of which are involved in some one or more of said cases:

(1) Was the right to purchase given to one or two classes of persons by the 17th article of the treaty and its amendments?

(2) Who must have the qualification of a pre-emptor; the original settler, his vendee, or both?

(3) Is the settler's (or his vendee's) right to purchase limited to the sub-divisions actually covered by his improvements, or do they extend to the whole quarter?

(4) Can the original settler make sale prior to his proof before said commissioners, and is such sale valid?

(5) In such case is a parol sale sufficient to pass the right to purchase to the vendee? and if not, can a parol sale be made good by a bill in chancery to which the original settler is made a party?

(6) Is it necessary that the original settler, or his vendee, should make or offer to make proof of his settlement before said commissioners? and is a general offer to prove up, and a refusal to allow him to do so, sufficient to secure his right?

(7) Does the fact of the land having coal on or underlying it make it mineral land within the meaning of the treaty? and does such fact destroy the settler's right to purchase? and what is the rule when the land is partly underlaid with coal, and all valuable for agricultural purposes?

(8) To whom is the appraised value of the land to be paid? and is the settler required to pay interest?

(9) Is the settler required to refund the taxes paid by the patentee, and legal interest thereon?

(10) To whom does the patentee look for the repayment of the original purchase money for said land, and interest thereon?

The undersigned would also venture to request that the findings and rulings of the court upon the questions above suggested be made in writing and filed—to the end that they may serve as rules of law in the settlement of other causes not in court.

Complainant claims title to the land in controversy under the 17th article of the treaty, and the amendments thereto, made by and between the United States and the Cherokee Nation or Tribe of Indians, July 19, 1866, and

proclaimed August 11, 1866; and the supplemental article to said treaty, proclaimed June 10, 1868.

The 17th article of said treaty is as follows: "Art. 17. The Cherokee Nation hereby cedes, in trust to the United States, the tract of land in the state of Kansas which was sold to the Cherokees by the United States, under the provisions of the 2d article of the treaty of 1835; and also that strip of land ceded to the Nation by the 4th article of said treaty which is included in the state of Kansas; and the Cherokees consent that said lands may be included in the limits and jurisdiction of the said state. The lands herein ceded shall be surveyed as the public lands of the United States are surveyed, under the direction of the commissioner of the general land office, and shall be appraised by two disinterested persons, one to be designated by the Cherokee national council, and one by the secretary of the interior, and, in case of disagreement, by a third person, to be mutually selected by the aforesaid appraisers. The appraisement to be not less than an average of one dollar and a quarter per acre, exclusive of improvements. And the secretary of the interior shall from time to time, as such surveys and appraisements are approved by him, after due advertisement for sealed bids, sell such lands to the highest bidders, for cash, in parcels not exceeding one hundred and sixty acres, and at not less than the appraised value: provided, that whenever there are improvements of the value of fifty dollars ($50) made on the lands not being mineral, and owned and personally occupied by any person for agricultural purposes at the date of the signing hereof, such person so owning and in person residing on such improvements, shall, after due proof, under such regulations as the secretary of the interior may prescribe, be entitled to buy, at the appraised value, the smallest quantity of land in legal sub-divisions which will include his improvements, not exceeding in the aggregate one hundred and sixty acres; the expenses of survey and appraisement to be paid by the secretary out of the proceeds of sale of said lands: provided, that nothing in this article shall prevent the secretary of the interior from selling the whole of said neutral lands in a body to any responsible party, for cash, for a sum not less than eight hundred thousand dollars."

The amendment affecting said article is as follows: "* * * 2d. Strike out the last proviso in article 17, and insert in lieu thereof the following: Provided, that nothing in this article shall prevent the secretary of the interior from selling the whole of said lands, not occupied by actual settlers at the date of the ratification of this treaty, not exceeding one hundred and sixty acres to each person entitled to pre-emption under the pre-emption laws of the United States, in a body, to any responsible party, for cash, for a sum not less than one dollar per acre." 14 Stat. 804–807.

The supplemental article before referred to, or so much thereof as affects the rights of settlers, is as follows: "It is further agreed and distinctly understood that, under the conveyance of the 'Cherokee Neutral Lands' to the said American Emigrant Company, 'with all beneficial interests therein,' as set forth in said contract, the said company and their assigns shall take only the residue of such lands after securing to 'actual settlers' the lands to which they are entitled under the provisions of the 17th article and amendments thereto of the said Cherokee treaty of August 11th, 1866; and that the proceeds of the sales of said lands, so occupied at the date of said treaty by 'actual settlers,' shall enure to the sole benefit of, and be retained by the secretary of the interior as trustee for, the said Cherokee Nation of Indians."

Hill & Sallee, for plaintiff.

Wallace Pratt and Blair & Ferry, for defendant.

Before DILLON, Circuit Judge, and FOSTER, District Judge.

DILLON, Circuit Judge. The plaintiff claims to be one of the class of persons protected by the 17th article of the treaty, and files his bill in equity to enforce that right, insisting that the defendant holds the legal title to the one hundred and sixty acres of land in controversy in trust for him.

Under the agreed facts, the court is of opinion that the plaintiff is entitled, on the payment to the defendant of the appraised price of two dollars per acre, without interest, and the amount of taxes on the said land paid by the defendant, with interest thereon at the legal rate of seven per cent per annum, to a decree that the defendant convey the land in question to him. The rights and equities of the government and the defendant company, as to the amount received by the defendant over the amount which was paid to the government for the land, viz., one dollar per acre, can be adjusted between them, and does not concern the plaintiff.

It is implied in the above conclusion, that we are of opinion that one who is an "actual settler," within the meaning of the treaty, at the date of its ratification, and entitled to its protective provisions, may, after that time and before making proof under the regulations of the secretary of the interior, transfer his right to purchase the land to which he is entitled, and that the grantee may make the required proof, and thus entitle himself to make the purchase at the appraised value. If the land had not been patented by the government, the grantee, after making the due proof of his grantor's right at the date of the ratification of the treaty, would be entitled to make the purchase, if not in his own name, then in the name of his grantor, who would hold it for the benefit of the grantee.

The 17th article of the treaty does not in terms require the settler to be in possession at the time of his purchase; but he must be

in actual occupancy at the date of the ratification of the treaty in order to be within its provisions. If thus in possession his right would descend to his heirs, and, in our judgment, it may be devised or conveyed if it was complete when the treaty was ratified.

The intention of the senate throughout to protect the "actual settler" is unmistakable, and accords with the uniform practice of the government in this respect. It was the rights of those who owned and personally occupied their improvements that the treaty sought to guard and secure. The actual settler must own the improvements in his own right and not for another, and he must personally occupy the improvements, or the land on which they are situate, for agricultural purposes, and he must thus own and occupy them at the date of the ratification of the treaty. If he was such an owner and occupier, the treaty intended to give him the preferable right to purchase. His rights were fixed; and no one is benefited by holding that he may not transfer his right when it is thus consummate. To hold otherwise would be to imprison the settler for the time without any advantage to the government, or any rightful advantage to any one else.

What we decide is, that if the right of the actual owner and occupier at the date of the ratification of the treaty to buy the land is complete, he may, after that, transfer to another his right in any mode which is effectual as between them, and the grantee succeeds to the grantor's rights in this respect. This court so held in Langdon v. Joy [Case No. 8,062], in which holding Mr. Justice Miller concurred.

The land in question was used by the settler for agricultural purposes, and is not "mineral land" by reason of a coal deposit underlying a portion of it. Lead and zinc, and perhaps other mineral deposits, were known to exist not far from, if not within, these "neutral lands," and it was lands containing such deposits that was meant by the word "mineral" as used in the treaty. In sales of the public lands in Iowa, Missouri, and Kansas, lands containing coal deposits have not been reserved by the government as "mineral" lands.

In this case the improvements were on and covered each of the forty-acre tracts constituting the quarter-section of land in controversy. It is clear, therefore, that the plaintiff's rights extend to each of the forty-acre tracts included in the one hundred and sixty acres claimed by the plaintiff.

What is said above, expressly or by implication, substantially answers all the questions submitted, except the question whether the treaty, as finally amended and ratified, provides for one or two classes of "actual settlers." This question is not necessarily involved in the present case, and as its solution is not unattended with difficulties, we do not now pronounce any definite opinion upon it. In the regulations of the secretary of the interior on this subject, he construed the 17th article of the treaty as providing for two classes of settlers, viz.: (1) Those who owned and personally occupied improvements for agricultural purposes, of the value of fifty dollars, at the date of the signing of the treaty, July 19, 1866. (2) Those who, after the signing (July 19, 1866), and before the ratification of the treaty (August 11, 1866), were actual settlers upon the land, having the qualifications of pre-emptors under the pre-emption laws of the United States.

The provisions of the first and second provisos, in respect of actual settlers, being in pari materia, must be taken and construed together; and thus regarded, the leading purpose of the second amended proviso seems to have been to secure the rights of those settlers mentioned in the first proviso by prohibiting a sale, by the secretary of the interior, en masse, which would cut them off—thus limiting, and not enlarging, the power previously given to this officer, and extending this protection to the settler from the date of the signing of the treaty July 19th, to the date of its ratification, August 11th; and the words in the second proviso, "to each person entitled to pre-emption under the pre-emption laws of the United States," if not intended merely as words of limitation on the power of the secretary to sell, mean probably no more than that the settler must have the qualifications of a pre-emptor as to citizenship of the United States, and be the head of a family, or a widow, or a single man over the age of twenty-one years, not owning three hundred and twenty acres of land elsewhere, etc., to be entitled to the benefit of the treaty. But the provisions of the pre-emption laws, as to extent and character of improvements, so far as they conflict with the express provisions of the first proviso of the 17th article of the treaty, in this regard, would be controlled by the provisions of the treaty.

We doubt whether the treaty, as amended, provides for two distinct classes, making separate provisions of a different character as to each class, as the secretary of the interior seems to have supposed. But we are not prepared to express any final opinion on the subject, and leave it open. On the payment of the purchase money and taxes, as above stated, into court for the defendant, the plaintiff may have a decree for the lands. Decree accordingly.

For further construction of the 17th article of the treaty, see Langdon v. Joy [Case No. 8,062].